IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

David T. Johnson                    :

    Plaintiff                       :

    v.                              : (Case No. 3:15-CV-1531)

Carolyn W. Colvin                   : (Judge Richard P. Conaboy)
Acting Commissioner of
Social Security                     :

    Defendant                       :

_____

**Memorandum**

We consider here Plaintiff's appeal of a denial of Social Security Disability benefits and Supplemental Security Income benefits.  An Administrative Law Judge ("ALJ") initially denied Plaintiff's clam by decision (Doc. 11-2) dated April 26, 2013.  The ALJ's decision was affirmed by the Appeals Council on January 13, 2015 (R.7) whereupon Plaintiff appealed to this Court.  This case has been briefed (Docs. 14 and 17) by the parties and is ripe for disposition.

**I.   Background.**

The ALJ who evaluated Plaintiff's claim found that Plaintiff has the Residual Functional Capacity ("RFC") to perform light work, subject to certain limitations, that exists in the national economy.  (R.56).  Plaintiff's appeal is based upon four assertions: (1) that the ALJ erred in failing to properly apply the

treating physician rule; (2) that the ALJ erred in substituting his medical opinion for that of the treating physicians; (3) that the ALJ erred in failing to include all well-supported impairments in his RFC finding and, thus, in the hypothetical question posed to the Vocational Expert; and (4) that the ALJ erred in finding that the Plaintiff was not completely credible.  (Doc. 14 at 19-20).

Plaintiff was afforded two hearings before the ALJ.  At the first hearing (conducted October 16, 2012) Plaintiff was represented by his attorney, Steven Hough.  Also present was Dr. Paul Anderson, a Vocational Expert.  (R.63).  Plaintiff's testimony may be summarized as follows.  He was born on March 10, 1971 and was 41 years of age at the time of the hearing.  At the time of the hearing, he was 5'9" and weighed 280 pounds.  He was single and had never been married.  He was then living with his aunt and had only one month earlier been released from a drug rehabilitation program. Before entering the rehabilitation program he had been living with his mother for several years.  He had lost his driver's license due to a suspension incident to unpaid fines from a traffic citation. (R.68-69).

Plaintiff arrived at his hearing by bus.  He completed the twelfth grade and was enrolled in a vocational/technical carpentry course.  Since his alleged disability onset date (January 17, 2011) he had tried to return to work in December of 2011 at a pizza shop. He lasted three days in this abortive attempt to resume working.

2

He did not work between July of 2010 and January of 2011 because he was in prison for much of that time.  Initially, he was incarcerated for retail theft and, after being released he was re-incarcerated for a "hot urine".  (R.70-72).

Plaintiff receives $200.00 in food stamps each month but does not receive cash assistance.  When he tried to work at the pizza shop in December of 2011, he was forced to quit because of constant pain in his low back and left side.  The pain in his left side was at the site where he had undergone surgery for a collapsed lung. The Plaintiff had been taking 800 milligram strength Ibuprofen but the medication would not control his pain.  His pain is aggravated by physical activity.  The doctor had prescribed Percocet for his pain but he was reluctant to take it because he had been "clean" for over ten months.  His drug of choice had been cocaine which he usually smoked.  He used the drug daily at a level that cost him about $100.00 per day.  He also abused alcohol daily for many years.  He was forced to resort to theft to support these habits and his apprehension for one act of theft resulted in his incarceration.  He used cocaine and abused alcohol for about 15 years.  (R.73-77).

Plaintiff's work history includes a job at a McDonald's restaurant from 2007 through 2009.  He liked working there and performed such tasks as sandwich maker and maintenance man.  He described himself as a "crew leader" but his description of his

3

duties discloses that he was merely showing new hirees how to set up a milk shake machine or how to work the deep fryers.  He did not actually supervise anyone in a managerial sense, but because he had been working in the store for a time, he "guided" the new hirees to "make sure the food was getting out."  He would sometimes be sent to the freezer or stockroom to count how much of a given product was in the store and provide this information to his manager who would use it to decide what and how much to restock.  (R.78-83).

Before working at McDonald's, Plaintiff worked in a warehouse, from March through July of 2010.  In this job, Plaintiff would operate a forklift to take snowplow blades to a location where the blades would be ground with an electric hand grinder.  Plaintiff would then transfer the blades from the forklift to a horse (presumably a sawhorse) by hand.  Some of the blades weighed up to 90 or 100 pounds.  (R.84-85).

Plaintiff smokes approximately two cigarettes per day.  Before undergoing his lung surgery he had been a pack-a-day smoker and chewed tobacco as well.  Even smoking two cigarettes a day bothers his breathing.  (R.85).

Plaintiff can read and write English.  He doesn't perform any household chores and spends much of his day at a computer café where he uses Facebook to chat with friends.  He can type to some unspecified extent.  He regularly attends Alcoholics Anonymous meetings at a church near his place of residence.  He walks to

4

these meetings and it takes him approximately three minutes to cover the distance.  (R.86-87).

From July to September of 2011, Plaintiff was a "prep cook" at Arby's.  He worked at Arby's while on work release from his incarceration on the retail theft charge alluded to earlier.  He completed the twelfth grade, although he acknowledged being in a slow learner or special education program.  When he was given tests a tutor would read him the questions and he would then give his answer.  When he filled out his application for Social Security benefits, his mother assisted him because he could not understand some of the questions.  She then wrote his answers on the application.  He never was required to read or write anything in the course of his work at the various restaurants where he was employed.  He learned these jobs by having someone physically demonstrate how to do them.  When he later "supervised" other people, he would simply show them how to do those things he had been shown by his superiors.  (R.88-90).

Plaintiff gets confused on things such as dates and has become increasingly forgetful since undergoing surgery.  His memory, however, was always poor and he thinks of himself as "a real slow learner."  It took him a long time to learn how to get on the computer and use Facebook.  He enjoys Facebook because it keeps his mind off drugs and alcohol.  Other than using Facebook, he does not use the computer for other purposes except to listen to music.

5

When he used the cash register during his employment with MacDonald's, he found it easy because that cash register was designed with pictures of the food items being purchased and the device would automatically calculate the price.  At the other fast food places where he worked, the cash registers merely featured numbers and he was unable to use them.  (R.90-93).

Plaintiff becomes dizzy and light-headed at times and thinks that may be because of his high blood pressure.  These bouts of dizziness happen approximately once a day and last for about five seconds.  Along with his high blood pressure and rib and back pain, Plaintiff experiences sporadic swelling of his lower left leg and pain in his right wrist.  He expressed concern because his prescriptions for blood pressure and anxiety were running out and he had not been approved yet for a medical card. Plaintiff expressed regret that he could not work and mentioned that he "worked for a lot of years."  He stated that the pain he experiences in his back, ribs, lower leg and wrist make it impossible for him to work. Plaintiff takes two naps each day because he does not sleep well at night.  The ALJ noted that Plaintiff stood up several times while testifying.  Plaintiff responded that he could sit for only about 20 minutes at a time because of pain in his lower back.  (R.94-99).

At Plaintiff's second hearing (conducted March 15, 2013) the same ALJ presided and Attorney Hough was also present along with

6

the vocational expert.  Preliminary discussions resulted in an
amendment of Plaintiff's onset date to July 1, 2010.  The testimony
at the second hearing may be summarized as follows.  Plaintiff's
condition had not changed since the first hearing.  Plaintiff had
been offered Oxycodone for pain in the interim but he declined to
use it.  He had begun taking Tramodol for his pain and found that
it did help somewhat.  However, it did not alleviate his lower back
pain.  Plaintiff had been on a sleep aid medication called Seroquel
but had recently switched to Ambien because it was less expensive.
He still had not been approved for a medical card and he had to
economize.  The Ambien affects his balance and he has fallen on the
steps as a result.  The Ambien does not help significantly with his
insomnia because he is still on a low dose.  (R.102-105).

Much of the balance of Plaintiff's testimony was cumulative of
his testimony at his first hearing.  By way of new information, he
testified that he can walk approximately one block before the pain
in his low back forces him to sit down.  He must sit for
approximately five minutes before he can resume walking.  He thinks
that he can lift three or four pounds repetitively without
aggravating his back pain.  The pain in his low back in constant
but physical activity makes it worse.  (R.105-106).

Plaintiff left his job as a "prep cook" at Arby's in 2011
because he developed pneumonia so severe that lung surgery was
required.  Afterward he could not perform the Arby's job due to

7

breathing difficulties.  He continues to experience pain in his ribs on the left side at the site of his incision from the lung surgery.  This pain extends from his ribs into his mid-back and lower back.  When he lifts even light objects (e.g., a bag of clothes) he experiences a sharp pain in his ribs and back.  (R.106-111).

Vocational Expert Paul Anderson also testified at the second hearing.  In response to hypothetical questions posed by the ALJ, Mr. Anderson stated that his review of the records indicated that Plaintiff could no longer perform any of his past relevant jobs. Mr. Anderson believed that, presuming the accuracy of the limitations in the ALJ's hypothetical question, Plaintiff could perform light work limited to routine-repetitive tasks as long as he was not exposed to heights, dangerous equipment, temperature extremes or environmental irritants.  Mr. Anderson did state that given the aforementioned limitations, Plaintiff could perform such unskilled jobs as a bakery worker, a cashier, and a potato chip sorter.  (R.116-117).  When the ALJ made the hypothetical question more restrictive by specifying that Plaintiff could no longer perform even routine-repetitive tasks on a sustained basis, Mr. Anderson stated that in that event Plaintiff would be unemployable. Mr. Anderson clarified that missing more than two days of work per month would not be tolerated by an employer of an unskilled worker. (R.117-118).  When questioned by Plaintiff's counsel whether,

assuming that Plaintiff's IQ was 50 as indicated by the evaluation of a licensed psychologist, Plaintiff could still perform the unskilled jobs the Vocational Expert had previously identified as within Plaintiff's capabilities, Mr. Anderson declined to answer on the basis that that determination was "a medical issue".  (R.118-119).

### A.    Physical Impairment Evidence.

The medical evidence of record indicates that Plaintiff suffers from high blood pressure, obesity, and status post left-sided posterial lateral thoracotomy with total lung decortication. His obesity and high blood pressure have persisted for years and are documented copiously throughout his medical records.

Plaintiff developed a pneumonia and concomitant hypoxemic respiratory failure, as diagnosed by Dr. Timothy Clark in the Carlisle Regional Medical Center Emergency Room, in January of 2011. (R.401).  This condition caused tachycardia and low oxygen levels and required mechanical ventilation and placement of a left chest tube.  Ultimately, Plaintiff had to be intubated when efforts to wean him off the vent were unsuccessful for a period of approximately ten days.  (R.403).  During the ten day period of his intubation, Plaintiff was sedated via various medicinal drips and he was unable to provide his physician with a medical history. (R.405).  Finally, on February 7, 2011, some 11 days after Plaintiff's admission, Dr. Adam Braze performed thoracic surgery in

the nature of a total lung decortication with the aim of restoring Plaintiff to normal respiration.  (R.664-665).  Upon post-operative examination on February 27, 2011, Dr. Braze placed the Plaintiff on light duty for six weeks and instructed him to follow up with his primary care physician.  Plaintiff was hospitalized for approximately 30 days as a result of his respiratory illness and related treatment and surgery.

### B.   Mental Impairment Evidence.

The record confirmed that Plaintiff suffers from severe cognitive disorder.  The degree of impairment caused by this cognitive disorder is difficult to determine with certainty from this record.  Certainly Plaintiff had significant learning difficulties as a child.  His scholastic record indicates that he was categorized as a special needs student with a measured IQ of from 71-75 by the age of 8; that he failed the first grade in 1977-78 and was passed to the second grade "on age" in 1978-79; that he was denominated an educable mentally retarded person when he reached the seventh grade; and that in a standardized test given to those in his age group in 1984 he was able to correctly respond to only 16 of 76 reading comprehension questions and 17 of 78 mathematics questions.  (R.286-288).

On April 28, 2008, Plaintiff underwent a psychiatric evaluation by Henry Wehmen, M.D..  Dr. Wehmen found that he suffered from major depressive disorder, personality disorder with

dependent and anti-social features, and he was assessed a Global Assessment of Function ("GAF") score of 50. [1]

Between May 9, 2012 and June 13, 2012, Plaintiff participated in a five-week course of treatment at the White Deer Run/Cove Treatment Center for drug and alcohol dependence. (Doc. 11-11, Exhibit No. 12 F). Plaintiff's stay at White Deer Run was his fourth attempt to detoxify. (R.815). While at White Deer Run, he was initially assessed a GAF score of 45, even lower than that assessed by Dr. Wehmen more than three years earlier.

On October 10, 2012, Plaintiff underwent a psychological evaluation by William D. Thomas, a licensed psychologist. (Doc. 11-10, Exhibit No. 7 F). Mr. Thomas administered Plaintiff the Wechsler Adult Intelligence Test. The results of that test indicated that Plaintiff had a verbal IQ of 56, a performance IQ of 52, and a full scale IQ of 50. Plaintiff's working memory and processing speed were assessed at levels within the lowest .1% of the population - - analagous to one in one thousand. This assessment means that roughly 999 out of 1,000 people who took the test scored higher than Plaintiff. Mr. Thomas also found that

---

[1] While the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders no longer assesses symptom severity, diagnostic severity, and disability in terms of Global Assessment of Function Scores, at the time of Plaintiff's assessment by Dr. Wehman the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning on a scale of 1 - 100. A GAF score of 41-50 indicates serious impairment and symptoms such as suicidal ideation, severe obsessional rituals, frequent shoplifting or any impairment in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders 34 (4th Ed., 2000).

Plaintiff read on a third grade level and spelled and did arithmetic on a first grade level.  Thomas concluded that the test results "indicate the presence of widespread, diffuse, and generalized learning disabilities" and that he (the Plaintiff) is "unable to read, write, or perform math at a social survival level."  Mr. Thomas did acknowledge that Plaintiff's performance was significantly lower than had been the case when his intelligence had been tested during his school days.  At that time his IQ scores had been indicative of a "Borderline Normal/Mild Intellectually Deficient Range".  Thomas stated further that Plaintiff's "cognitive decline is significant and may well be the effects of long-standing and chronic polysubstance abuse and/or the anoxic effects of his severe pneumonia, collapsed lung, and required ventilation."  Thomas concluded that given Plaintiff's cognitive decline, illiteracy and widespread cognitive limitations as well as his social/emotional disturbance it is apparent that he is incapable of gainful employment".  (R.707-710).

## II.  ALJ Decision.

The ALJ's decision (Doc. 11-2 at 42-56) was unfavorable to the Plaintiff.  It includes the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31,

2014.

2.   The claimant has not engaged in substantial gainful activity since July 1, 2010, claimant's alleged onset date.

3.   The claimant has the following severe impairments: high blood pressure, obesity, status post left-sided posterial lateral thorocotomy with total lung decortication, cognitive disorder, and polysubstance abuse.  (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d) 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) and that the claimant is capable of performing routine, repetitive tasks. He cannot be exposed to hazards such as unprotected heights or dangerous equipment, the claimant cannot tolerate concentrated exposure to fumes, odors,

dust, gases, areas of poor ventilation, temperature
extremes, or humidity.

6.  The claimant is unable to perform any past relevant
    work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on March 10, 1971 and was 39
    years old, which is defined as a younger individual
    age 18-49, on the alleged disability onset date (20
    CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education
    and is able to communicate in English (20 CFR
    404.1564 and 416.964).

9.  Transferability of job skills is not material to the
    determination of disability because using the
    Medical-Vocational Rules as a framework supports a
    finding that the claimant is "not disabled," whether
    or not the claimant has transferable job skills.
    (See SSR 82-41 and 20 CFR Part 404, Subpart P,
    Appendix 2).

10. Considering the claimant's age, education, work
    experience, and residual functional capacity, there
    are jobs that exist in significant numbers in the
    national economy that the claimant can perform (20
    CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as

defined in the Social Security Act, from July 1, 2010 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

## III. Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.55).

**IV. Standard of Review**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

16

talismanic or self-executing formula for
adjudication; rather, our decisions make
clear that determination of the existence *vel
non* of substantial evidence is *not* merely a
quantitative exercise.  A single piece of
evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

17

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

18

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**V.   Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.    Plaintiff's Allegation of Error.**

**1.    Whether the ALJ Erred in Failing to Properly Apply the Treating Physician Rule?**

As Plaintiff's counsel asserts (Doc. 14 at 22) the "Treating Physician Rule" set forth at 20 CFR § 404.1527 directs

that the opinion of the treating physician be given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  Plaintiff's counsel then offers the opinion of "Dr. Thomas", who found that Plaintiff had a full scale IQ of 50 after administering the Wechsler Adult Intelligence Scale, as meeting the criteria for disabling mental retardation at Social Security Administration Listing 12.05B.

The Government responds that "Mr. Thomas", a consulting psychologist, is not a "treating source" as defined in the Social Security regulations.  (Doc. 17 at 15). The Government asserts further that Mr. Thomas cannot properly be described as a "doctor" since he holds an M.S. degree.  The Court must agree with the Government on this point inasmuch as Mr. Thomas' stationery indicates that, while he is a licensed psychologist, he is not a medical doctor.

The Government also contends that Mr. Thomas may not be properly described as a "treating source" as defined at 20 CFR § 404.1502 because he had no ongoing treatment relationship with Plaintiff and saw him only for purposes of obtaining a report of his Social Security Disability claim.  Our review of the record indicates that Mr. Thomas saw Plaintiff on only one occasion on referral by Plaintiff's attorney.  The record is also plain that Mr. Thomas afforded Plaintiff no treatment.  While we see nothing

improper about Plaintiff's counsel's effort to develop the record in this fashion, the limited nature of Plaintiff's contact with Mr. Thomas does not permit Mr. Thomas to be characterized as a "treating physician" and precludes the Court from giving his assessment of Plaintiff's cognitive abilities controlling weight. Accordingly, the ALJ may not appropriately be faulted for declining to give Mr. Thomas' opinion controlling weight here.

> 2.   **Whether the ALJ Erred in Substituting his Opinion for that of Psychologist Thomas?**

Plaintiff's counsel states that the ALJ erred by using his personal observation of the Plaintiff as a basis to reject Mr. Thomas' assessment of Plaintiff's IQ. (Doc. 14 at 25).  Reference is made to Morales v. Apfel, 225 F.3d 310 (3d. Cir. 2000), a case in which an ALJ refused to accept the validity of an IQ score because it did not, in his opinion, "comport with the claimant's appearance and demeanor or with evidence in the record." (Morales, supra, at 318).  The Third Circuit found as follows:

> An ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inference drawn from the records.  Certainly, no doctor in the record made any statement which would support the ALJ's speculation that "[a] person with an IQ in the 50's could not function in a normal work environment as claimant was able to do when it suited him.

Id.

Plaintiff's counsel contends that the ALJ's categorical rejection of the psychologist's assessment of Plaintiff's IQ was impermissible because it was based on his personal observations and was unsupported by counterveiling medical evidence as required by Schweiker and Morales, supra.  Plaintiff's counsel also asserts that the ALJ erred by not considering whether, even if Plaintiff's IQ was in the 70-75 range as suggested by his primary school test scores, his IQ in combination with his other documented physical and mental disorders could support an equivalence determination of disability under any of the subsections of Listing 12.05 Mental Retardation of the Social Security regulations.  (Doc. 14 at 24-25).  The Government responds, citing Keck v. Colvin, 2014 WL 4793933, that an ALJ may reject IQ scores that are inconsistent with the record as long as he provides an adequate explanation.  (Doc. 17 at 18-19).  This Court does not doubt the accuracy of this proposition.  It does, however, have serious reservations concerning the adequacy of the the ALJ's explanation for assigning Psychologist Thomas' IQ assessment little weight.  The Court's first reservation is that the ALJ's explanation obviously stems in large part from his observation that "the claimant did not present as an individual who is socially and cognitively limited to the extreme extent reported by Mr. Thomas." (R.49).  This conclusion by the ALJ is precisely the type of speculation prohibited by the

Morales Court.   In fact, Morales stands squarely for the proposition that, in a case involving mental disability, an ALJ should not substitute his lay opinion of a claimant's IQ or mental state for that of an expert.[3]   Morales, supra at 319.

The only other evidence in this record that relates to the Plaintiff's IQ is that provided by the temporally remote IQ scores taken decades before Mr. Thomas' evaluation.   These scores, 71 and 75 respectively, were measured by unknown individuals with unknown credentials and, if accurate, reflect a borderline retarded individual.   We note here that Plaintiff was also classified as an "EMR" student, an educable mentally retarded person, by his teachers and counselors.

Regarding the ALJ's statement that Mr. Thomas did not provide sufficient medical explanation for Plaintiff's decline in IQ, the Court cannot agree.   Mr. Thomas' proffer of either Plaintiff's prolonged polysubstance abuse or his oxygen deprivation incident to his long respiratory hospitalization in 2011 both constitute plausible medical explanations for Plaintiff's reduced cognitive ability.   One does not have to be a medical doctor to know that prolonged alcohol abuse and a period of significant oxygen deprivation can both damage the brain and result in reduced cognitive efficiency.   The Court will take judicial notice of these

---

[3] In fact, Morales specifically prohibits this in respect to the IQ assessment of a psychologist who was not a medical doctor, exactly the scenario in the instant case.

facts.  Accordingly, we find that the ALJ did not properly evaluate the evidence of Plaintiff's IQ and improperly substituted his opinion for that of an expert.

**VI.  Conclusion.**

For the reasons stated above, the Court cannot conclude from this record that substantial evidence, that quantity of evidence that a reasonable mind might accept as adequate to support a conclusion, supports the Commissioner's decision to deny benefits in this case.  The record is simply inadequately developed on this point. Accordingly, the Court will direct a remand of this case in order that additional evidence may be adduced regarding the extent of Plaintiff's cognitive deficiency and the level of his IQ.  An appropriate Order will be filed contemporaneously.[4]

BY THE COURT

S/Richard P. Conaboy
Honorable Richard P. Conaboy
United States District Court

Dated: February 8, 2016

---

[4] The Court has not addressed other assignments of error by Plaintiff inasmuch as further proceedings may render them moot and in any event they need not be addressed at this time.